UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

BUSINESS PAYMENT SYSTEMS, LLC                                                          PLAINTIFF

v.                                                                     CIVIL ACTION NO. 3:06CV-378-S

BA MERCHANT SERVICES, LLC f/k/a NATIONAL PROCESSING
COMPANY LLC f/k/a NATIONAL PROCESSING COMPANY                      DEFENDANT

**MEMORANDUM OPINION**

      This matter is before the court on motion of the defendant, BA Merchant Services, LLC (also referred to herein as "Processor"), to dismiss the complaint (DN 6). The plaintiff, Business Payment Systems, LLC (also referred to herein as "Marketer"), has opposed the motion to dismiss and also seeks partial summary judgment in its favor (DN 11). For the reasons stated herein, the motion to dismiss will be granted in part and denied in part, and the motion for partial summary judgment will be denied.

      The parties to this action entered into a business relationship memorialized by a contract known as the "Marketing Agreement." The Marketing Agreement consists of a seven-page document and various schedules and amendments. The parties entered into this agreement in June, 2000 for an initial term of three years. The agreement was extended and will expire in 2008 absent a successful bid in this lawsuit by Business Payment Systems to be relieved of any further obligation to perform during the duration of the term.

      Business Payment Systems entered into the Marketing Agreement to act as a Marketer for BA Merchant Services, the Processor. As Processor for various credit card companies such as Visa and MasterCard, BA Merchant Services acquires, processes, and transmits electronic data related to credit and debit card transactions initiated by merchants. As Marketer for this Processor, Business Payment Systems contracted to act as a so-called "Independent Sales

Organization/Member Service Provider" or "ISO/MSP," soliciting merchants to apply for credit/debit card processing services with companies such as Visa and MasterCard through the Processor.  Marketer brings Processor applications for merchant contracts for review and approval in accordance with Processor's underwriting standards.  Under the terms of the Marketing Agreement, Marketer is to be compensated for these merchant contracts pursuant to a formula, the precise operation of which is not germaine to this decision.[1]  Under the Agreement, Marketer agreed to solicit merchants solely for Processor and no other company.  Processor evaluates the merchant applications brought to it by Marketer.  Approved merchants enter into a Merchant Systems Agreement with Processor.  As defined in the Marketing Agreement, § 1.8, a "Merchant Systems Agreement" is a "tri-party agreement entered into among [Processor], Bank and a Merchant pertaining to Transactions by such Merchant and the provision of Merchant Systems to such Merchant."  Marketer is not a party to these agreements.  Its involvement is essentially limited to the procurement of merchant applications for a fee.

The Marketing Agreement provides for the payment of "Residuals" to Marketer for its performance under the Agreement:

> 5. <u>Fees Payable to [Marketer].</u> [Processor] agrees to pay [Marketer] Residuals in accordance with the pricing set forth on Schedule B as may be amended from time to time...In the event there is an increase in rates charged to [Processor] by any vendor, third party or Card Association, all such charges may be passed on to [Marketer] and/or Merchant at [Processor]'s sole discretion and shall be contained on the next monthly advice supplied to [Marketer].

In § 1.10 of the Agreement, "Residuals" is defined as "the amount paid to [Marketer] on a monthly basis by calculating the difference between the assigned Merchant discount rate and the then current ISO/MSP rate on residual eligible terms listed in Schedule B as may be adjusted from time to time

---

[1] The only issue presently before the court is whether the terms of the Marketing Agreement granted Processor the unfettered right to change one of the components of the formula, the "ISO/MSP Rate."  This is a matter of contract analysis only.  Thus this ruling is limited to answering that question and thereafter discerning whether the complaint states viable claims.

by [Processor] in its sole discretion." Schedule B sets out the terms, and contains similar language to the Marketing Agreement:

> [Processor] agrees to pay [Marketer] Residuals (as hereinafter defined) in accordance with the pricing schedule set forth below, as such pricing schedule may be amended or adjusted from time to time...As used in this Schedule the term "Residuals" means the amount paid by [Processor] to [Marketer] on a monthly basis based upon the difference between the assigned Merchant discount rate and the then current ISO/MSP rate on Residual eligible items listed in the pricing schedule set forth below, as such rates may be adjusted from time to time by [Processor] in its sole discretion.

The schedule then sets out the requirements that Marketer must meet in order to receive the pricing listed in the Pricing Schedule at the bottom of the page. One of these requirements is that Marketer submit a monthly minimum number of applications during 2000. Marketer must "submit at least 300 or more applications per month through the end of December 2000 and thereafter for the remainder of the Agreement." It also states that "[Processor] reserves the right to adjust [Marketer]'s pricing after the initial six month period if [Marketer] averages less than 300 applications per month for any three consecutive months." There is no dispute that Marketer has continually met the 300-application requirement.

Marketer receives monthly payments for its services, purportedly calculated in accordance with the Residuals formula. At some point,[2] Marketer became convinced that Processor had been shortchanging it by manipulating the calculation of the Residuals.

---

[2] The timeframe in which this claim came to light is unclear. Sam Chanin, CEO of Marketer, stated in his affidavit that Marketer was aware by March, 2004 of Processor's failure to tender all Residuals, notified Processor of its concerns, and never acquiesced to receive less than 100% of what was due in Residuals. Counsel for Marketer sent a letter to Processor on September 9, 2005 alleging that various business practices of Processor breached the terms of the Marketing Agreement. There was no mention in that letter of any concerns about Residuals calculations. Processor states that Marketer agreed to changes in the ISO/MSP Rate. It contends that Marketer never received less than the original Residuals provided for in Schedule B and in fact received more by agreement. In his affidavit, Mark Vogt, Senior VP of Processor, stated that Marketer "actually participated and negotiated with [Processor] in shared and increased margins due to interchange rate increases." He avers that Marketer never asserted that it was entitled to the entire amount of any increase charged to a merchant over and above an interchange rate until this lawsuit. These affidavits illustrate the dispute over the intention of the parties to the Agreement.

Marketer admits that the ISO/MSP Rate can be raised by Processor in order to pass on any increase in rates charged to Processor by a vendor, third party or Card Association, or in the event Marketer averages less than 300 applications per month for any three consecutive months. It contends, however, that these are the *only* instances in which Processor has the discretion to change the ISO/MSP Rate. Processor claims that it has the unfettered right to change the ISO/MSP Rate, noting the language in the definition of "Residuals" in both the Marketing Agreement and Schedule B referring to the "then current ISO/MSP rate on Residual eligible items listed in the pricing schedule set forth below, *as such rates may be adjusted from time to time by [Processor] in its sole discretion.*"[3]

First, we note that "[a]n elemental principle of contract law is that a contract is to be interpreted or construed in accordance with the intention of the parties. The court must seek to ascertain how the parties intended their agreement to operate at the time they entered into it." " *L.K. Comstock & Company, Inc. v. Becon Construction Company*, 932 F.Supp. 948, 964 (E.D.Ky. 1994), *aff'd*, 73 F.3d 362 (6th Cir. 1995), *citing, Wilcox v. Wilcox*, 406 S.W.2d 152, 153 (Ky.App. 1966); *Communications Workers of America v. General Tel. Co.*, 236 F.Supp. 588, 589 (E.D.Ky. 1965).

The discrete question raised by Processor's motion is whether the "in its sole discretion" language left it free to change the ISO/MSP Rate at will. We conclude that Processor's motion to dismiss must be denied. Further, we find that the cross-motion of Marketer for partial summary judgment must also be denied as the language of the Marketing Agreement is reasonably susceptible to more than one interpretation.

In order to overcome a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), a plaintiff need plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955,

---

[3] Quotation from Schedule B. Similar language appears in the definition of "Residuals" in the Marketing Agreement, but referring to Schedule B for rates.

1974 (2007). Taking the facts alleged in the complaint as true, as we must, we conclude that Marketer has adequately stated a claim for breach of the Marketing Agreement for failure to pay the full amount of Residuals due.

The calculation of the monthly amount owed to Marketer is essentially a subtraction equation:

$$R \text{ [Residuals]} = M \text{ [Merchant Discount Rate]} - I \text{ [ISO/MSP Rate]}$$

In a nutshell, Marketer contends that Processor arbitrarily raised the ISO/MSP Rate, thereby reducing the Residuals paid to it. Resolution of the issue at bar is hardly as simple as this equation, however.

Significantly, nowhere in the Agreement is "ISO/MSP Rate" defined, such that the reader may intuit what it is and how an ISO/MSP Rate is reached. Schedule B states that "[Processor] agrees to pay [Marketer] Residuals (as hereinafter defined) in accordance with the pricing schedule set forth below..." In calculating the "Residuals" figure, Schedule B refers to the "then current ISO/MSP rate on Residual eligible items listed in the pricing schedule set forth below." It is not readily apparent from the language how these various provisions operate. What is apparent is that the Pricing Schedule is a key component in the formulation. However, it is not apparent to the untutored how various figures are derived. It would be unnecessary for the court to understand the operation of the pricing grid and the derivations of various rates if the plain language of the agreement left no doubt that Processor could alter the rates at will. It is not clear solely on an review of the terminology and syntax employed in the agreement what limitations, if any, are imposed upon Processor's discretion.

Schedule B states that the *rates*, including the then current ISO/MSP rate on Residual eligible items *listed in the pricing schedule*, may be adjusted from time to time by the Processor in its sole discretion. A later provision reserves to Processor the right to adjust Marketer's *pricing* if Marketer averages less than 300 applications per month for three consecutive months. Marketer

contends that by limiting its opportunity to adjust Marketer's pricing, it has established parameters for exercising its discretion in adjusting the ISO/MSP Rate. Whether adjusting Marketer's pricing is to any extent co-extensive with adjusting the ISO/MSP Rate is a matter not readily apparent from the language. There is no mention in the Pricing Schedule itself of an "ISO/MSP Rate." However, the Residuals definition refers to the ISO/MSP rate on Residual eligible items *listed in the pricing schedule.* Suffice it to say that the express terms of the agreement do not tell all concerning the operation of the provisions and the intent of the parties when entering into this agreement. The terms must therefore be construed in light of extrinsic evidence.

We have found the provisions in question are facially reasonably susceptible to more than one interpretation. "In order to ascertain the intentions of the parties and to resolve the ambiguity resulting from the interplay of these provisions, it is appropriate to consider all of the circumstances surrounding the transactions, including the acts and declarations of the parties and their underlying purposes." *L.K. Comstock*, 932 F.Supp. at 965. The affidavits submitted in support of the motion clearly evidence disputed facts concerning the circumstances surrounding the transactions and the intentions of the parties.

Further, the court will deny the motion to dismiss Count II alleging breach of the duty of good faith and fair dealing which runs with all contracts. *Ranier v. Mount Sterling National Bank*, 812 S.W.2d 154, 156 (Ky. 1991). Marketer claims that Processor was in exclusive control of the information necessary to calculate the Residuals, and that the exclusive and non-terminable relationship between the parties provided it no effective means of recourse. In light of the fact that this a complex, industry-specific relationship, and that the Agreement is unclear, the motion to dismiss the good faith claim will also be denied. The motions to dismiss and for partial summary judgment will be denied with respect to Counts I and II of the Complaint.

Count III of the Complaint alleges breach of fiduciary duty by Processor. Marketer asserts that Processor was a fiduciary "by virtue of its position of trust and authority and control over the

selection of merchants as Marketer's exclusive credit card processor." Complaint, ¶ 35. Marketer has offered no authority for the proposition that a fiduciary duty arises under such a circumstance. By all accounts, these are sophisticated business entities who entered into an arms length, for-profit business relationship. Section 12 of the Marketing Agreement states that "[i]t is expressly understood that [Marketer], [Processor] and Bank are in all respects independent parties to this Agreement." There is no evidence that this relationship implicated a duty for Processor to act "primarily for [Marketer]'s benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W. 2d 476, 485 (Ky. 1991). Count III of the Complaint will be dismissed.

Count IV of the Complaint alleges unjust enrichment as an alternate theory to the contract claim. There is no dispute that a binding contract exists between the parties. There is no dispute that the parties performed and are continuing to perform under the Agreement's terms. The claim for unjust enrichment asserts that "[Processor] has not compensated [Marketer] for the full value of the Services received from [Marketer]." Complaint, ¶ 40. The value of the services rendered by Marketer are defined by the Marketing Agreement. There can be no claim for unjust enrichment in this instance. *Codell Construction Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky.App. 1977). Count IV will be dismissed.

Count V alleges tortious interference with business relationships by charging excessive rates to merchants which caused merchants and agents to leave Marketer. *See,* Complaint ¶¶ 23, 24. In order to state a claim for tortious interference with business relationships, Marketer must plead (1) the existence of a valid business relationship or its expectancy, (2) defendant's knowledge thereof, (3) an intentional act of interference, (4) an improper motive, (5) causation, and (6) special damages. *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.* 242 F.Supp.2d 438, 450 (W.D.Ky. 2003). Marketer alleges that when a merchant chose to use a different processor, Marketer lost the residual stream that the merchant would generate. *See*, Complaint, ¶¶ 19-24. The

problem with this theory is that if and when Marketer lost business because Processor raised its merchant's rates, Processor correspondingly lost the same business. While the Complaint makes the bald allegation that the acts of Processor were "motivated by ill will and malice," (Complaint, ¶ 46) there are no facts alleged that would support such a finding. To intentionally drive away business from the hands of Marketer, would be to intentionally diminish its own revenues. There are no facts plead suggesting bad motive. Thus we cannot find any support for the allegation of ill will or malice necessary to state a claim for tortious interference with business relationships. Count V will be dismissed.

Count VI does not state a claim alleging a theory of liability. Rather it seeks declaratory relief as a remedy in addition to damages. The nature of an appropriate remedy will be addressed at a later point in the development of the case.

For the reasons set forth herein, the motion of the defendant to dismiss will be granted in part and denied in part, and the motion of the plaintiff for partial summary judgment will be denied by separate order.

**IT IS SO ORDERED.**